# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

CARLTON F. GUNN, individually
and on behalf of all persons
similarly situated,

                    Plaintiff,

v.

CONTINENTAL CASUALTY
COMPANY,

                    Defendant.

NO. 1:18-cv-03314

Hon. Charles P. Kocoras

**BRIEF OF THE NATIONAL ASSOCIATION OF**
**INSURANCE COMMISSIONERS AS *AMICUS CURIAE***

MICHAEL T. RAUPP
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000
(816) 983-8080 (FAX)
michael.raupp@huschblackwell.com

*Attorneys for the National Association*
*of Insurance Commissioners*

## DISCLOSURE STATEMENT

*Amicus Curiae*, National Association of Insurance Commissioners ("NAIC") discloses the following:

1. The full name of every party that the attorney represents in the case:

  National Association of Insurance Commissioners

2. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Husch Blackwell, LLP

3. If the party or *amicus* is a corporation:

  a. Identify all its parent corporations, if any:

    The National Association of Insurance Commissioners has no parent corporations.

  b. List any publicly held company that owns 10% or more of the party's or *amicus*' stock:

    The National Association of Insurance Commissioners, organized under the laws of the State of Delaware, is a non-profit corporation, operating under section 501(c)(3) of the Internal Revenue Code. As a non-profit corporation, the National Association of Insurance Commissioners has no stock; therefore, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 2

ARGUMENT ....................................................................................................................... 3

    I.      History of Long-Term Care Insurance .................................................... 3

    II.     Accurately Pricing Long-Term Care Insurance is Critical ................................. 4

    III.    The Washington Insurance Commissioner Has Extraterritorial Jurisdiction Over Rate Approval of Long-Term Care Certificates ........................................... 9

    IV.    The Filed Rate Doctrine Prevents Consumers from Challenging Rates Approved by the Washington Insurance Commissioner ...................................... 11

CONCLUSION .................................................................................................................. 12

CERTIFICATE OF SERVICE .......................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ex parte Cincinnati Ins. Co.*,
  51 So.3d 298 (Ala. 2010) .................................................................. 11

*Gunn v. Cont'l Cas. Co.*,
968 F.3d 802, 813 (7th Cir. 2020) ........................................................ 2

*McCarthy Fin., Inc. v. Premera*,
  347 P.3d 872 (Wash. 2015) .............................................................. 11

*Minihane v. Weissman*,
  600 N.Y.S.2d 102 (App. Div. 1996) ............................................... 11, 12

*Prentice v. Title Ins. Co. of Minnesota*,
  500 N.W.2d 658 (Wis. 1993) ............................................................ 11

*Schirmer v. State Farm Fire & Cas. Co.*,
  721 N.W.2d 307 (Minn. 2006) ......................................................... 11

*Tenore v. AT&T Wireless Servs.*,
  962 P.2d 104 (Wash. 1998) .............................................................. 11

## Statutory Authorities

15 U.S.C. § 1011 (2018) ...................................................................... 2

15 U.S.C. §§ 1011 to 1015 (2018) ...................................................... 2

Alaska Stat. Ann. § 21.53.070 (1990) .................................................. 9

Ark. Code Ann. § 23-97-306 (2005) .................................................... 9

Del. Code Ann. tit. 18, § 7104 (1989) ................................................. 9

I.R.C. § 501(c)(3) (2018) ..................................................................... i

Ind. Code Ann. § 27-8-12-17 (1991) ................................................... 9

Mont. Code Ann. § 33-22-1120 (1989) ............................................... 9

S.D. Codified Laws § 58-17B-14 (1989) ............................................. 9

Utah Code Ann. § 31A-22-1403 (1991) .............................................. 9

Wash. Admin. Code 284-30-600(1) (2010)...................................................................... 10

Wash. Admin. Code 284-54 (2008) ................................................................................ 11

Wash. Admin. Code 284-54-600 (1987) .......................................................................... 10

Wash. Admin. Code 284-60-060(2) (1983) ........................................................................ 6

Wash. Admin. Code 284-83-005 (2008)......................................................................... 6, 7

Wash. Admin. Code 284-83-090(1)(b) (2008) .................................................................. 7

Wash. Rev. Code § 48.01.060 (1947) .............................................................................. 10

Wash. Rev. Code Ann.  § 48.18.480 (1947) .................................................................... 11

Wash. Rev. Code Ann. § 48.01.020 (1947) ..................................................................... 10

Wash. Rev. Code Ann. § 48.02.080(3) (2009) ................................................................ 11

Wash. Rev. Code Ann. § 48.19.020 (1947) ..................................................................... 11

Wash. Rev. Code Ann. § 48.21.010(2)(b) (2016) ........................................................... 10

## **Rules and Regulations**

Fed. Civ. P. § 12(b)(6) ....................................................................................................... 2

Fed. Civ. P. § 56............................................................................................................... 2

Md. Code Regs. 31.14.01.14 (2021) ................................................................................. 9

## **Additional Authorities**

King, Eric, *Long-Term Care Insurance Pricing Basics*, CIPR Newsletter (Nov. 2016),
 https://www.naic.org/cipr_newsletter_archive/vol20_ltc_pricing.pdf ....................... 5

*Long-Term Care Insurance Model Act* (#640), NAIC (2017), *available at*
 https://content.naic.org/sites/default/files/MO640.pdf .............................................. 4

*Long-Term Care Insurance Model Regulation* (#641), NAIC (2017), *available at*
 https://content.naic.org/sites/default/files/MO641.pdf .............................................. 4

*Long-Term Care Insurance: Recommendations for Improvement of Regulation, Report of
 the Federal Interagency Task Force on Long-Term Care Insurance*, U.S. Dept. of the
 Treasury (Aug. 2020), https://home.treasury.gov/system/files/136/Report-Federal-
 Interagency-Task-Force-Long-Term-Care-Insurance.pdf ................................... 5, 7, 8

*Long-Term Care Insurance Task Force*, NAIC (2021),
  https://content.naic.org/cmte_ex_ltci_tf.htm ............................................................ 6, 8

*Model #640 State Chart*, NAIC(2020), *available at*
  https://content.naic.org/sites/default/files/ST640.pdf ................................................. 4

*Model #641 State Chart*, NAIC (2019), *available at*
  https://content.naic.org/sites/default/files/ST641.pdf ................................................. 4

*NAIC Guidance Manual for Rating Aspect of the Long–Term Care Insurance Model
  Regulation*, NAIC (2016) *available at*
  https://www.naic.org/documents/committees_b_senior_issues_160609_ltc_
  guidance_manual.pdf ................................................................................................. 6

*NAIC Guidance Manual for Rating of Long-Term Care Insurance Model Regulation*,
  NAIC, at 13 (Mar. 1, 2005), *available at*
  https://www.naic.org/documents/prod_serv_supplementary_ltc_gm.pdf .................... 7

NAIC Proceedings, 2d Qtr., p. 263-264 (2000), *available at* https://
  naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5614 ............ 6

NAIC Proceedings, Vol. I, p. 656-661 (1988), *available at* https://naic.soutronglobal.net/
  Portal/DownloadImageFile.ashx?fieldValueId=5321 .................................................. 4

NAIC Proceedings, Vol. I, p. 677-680 (1987), *available at* https://naic.soutronglobal.net/
  Portal/DownloadImageFile.ashx?fieldValueId=5304 .................................................. 4

NAIC Proceedings, Volume I-B, p. 569, 573-574 (1985), *available at*
  https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5294 ............. 3

NAIC Proceedings, Volume I-B, p. 569, 607 (1985), *available at*
  https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5294 ............. 3

Penn Treaty in Liquidation, https://www.penntreaty.com/Liquidation.aspx ................................. 8

SHIP in Rehabilitation, https://www.shipltc.com/home .............................................................. 8

*Topic: Long-Term Care Insurance*, CIPR (Feb. 9, 2021),
  https://content.naic.org/cipr_topics/topic_longterm_care_insurance.htm ................... 3

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Founded in 1871, the National Association of Insurance Commissioners (NAIC) is the United States' standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five United States territories. *See generally* NAIC, https://www.naic.org/ (last visited Sept. 16, 2021). Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, coordinate regulatory oversight, and represent the collective views of all state regulators domestically and internationally. The NAIC's members, together with the centralized resources of the NAIC, form the national system of state-based insurance regulation in the United States.

Throughout its history, the NAIC's purpose has been to provide its members with a national forum, which enables them to work cooperatively on regulatory matters that transcend the boundaries of their own jurisdictions. This allows for the development of standards to be applied by each state in regulating companies doing business in multiple states and provides a central point of communication and facilitation for joint initiatives with federal and international regulators. Collectively, the state insurance commissioners work to develop model legislation, rules, regulations, handbooks, white papers, and actuarial guidelines that promote and establish uniform regulatory policy.

The overriding objectives of the NAIC and its members are to protect consumers, promote competitive markets, and maintain the financial solvency of insurance companies and the financial stability of the insurance industry as a whole.

---

[1] This *amicus* brief was not authored in whole or in part by either party's counsel; neither a party nor a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

The insurance commissioners of the various states are charged with the responsibility of regulating the business of insurance within their respective jurisdictions pursuant to the McCarran-Ferguson Act of 1945, 15 U.S.C. §§ 1011 to 1015 (2018) ("McCarran-Ferguson Act"). Through the McCarran-Ferguson Act, Congress declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

The NAIC seeks to aid this Court by offering the legal and regulatory position and public policy perspectives of our association and NAIC member states. When the United States Court of Appeals for the Seventh Circuit remanded this case, it stated that it may be "useful to enlist the help of interested amici, including the National Association of Insurance Commissioners, . . . who can educate generalist federal courts about the broader implications of choice-of-law rules as applied to group insurance policies." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 813 (7th Cir. 2020). The NAIC respectfully submits this *amicus curiae* brief to provide further context to Background Section II of CNA's *Consolidated Memorandum in Support of its Rule 56 Filed Rate Defense Motion and Rule 12(b)(6) Motion to Dismiss* and to assist the Court in better understanding the state exercise of extraterritorial jurisdiction in the context of long-term care group policy rate review and approval.

## INTRODUCTION AND SUMMARY OF ARGUMENT

A choice of law analysis is inapplicable here, where the Washington Office of the Insurance Commissioner (OIC) properly exercised its authority in approving the rates for the CNA certificate issued to plaintiff Carlton Gunn. Long-term care insurance coverage has been underpriced for many years, resulting in at least two national companies being placed in rehabilitation. Among

other actions directed at company solvency and consumer protection in the long-term care market, the NAIC has addressed the historically inadequate premium rates by updating the rating requirement, to be applied prospectively, in its model law and regulation governing long-term care insurance. The certificate held by Mr. Gunn was originally issued prior to the new rules taking effect, which meant increasing the rates was necessary, under Washington law and in the judgment of the Washington OIC, to ensure adequate coverage for claims in future years.

Washington law provides the OIC with extraterritorial jurisdiction over rates for certificates issued to Washington residents under policies issued in another state. The filed-rate doctrine recognizes the authority of the Washington OIC to approve premium rates that are actuarially justified pursuant to legal requirements, making a choice of law analysis inapplicable.

## ARGUMENT

### I.   History of Long-Term Care Insurance

Long-term care insurance policies were first introduced in the 1960's. *See Topic: Long-Term Care Insurance*, CIPR (Feb. 9, 2021), https://content.naic.org/cipr_topics/topic_longterm_care_insurance.htm. In 1984, the NAIC established its first task force to address long-term care insurance.[2] At that time, private insurance provided "almost no mechanism to finance long-term care." NAIC Proceedings, Volume I-B, p. 569, 607 (1985), *available at* https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5294. Long-term care was "by far the largest gap in Medicare coverage, leaving both the elderly and disabled with substantial out-of-pocket expenditures that often [could not] be met from personal resources." *Id.*

---

[2] Instead of establishing a new task force, the charge of the Medicare Supplement and Other Limited Benefits Task Force would cover the long-term care issue and be reconstituted as the Medicare Supplement, Long Term & Other Limited Benefits (B) Task Force. NAIC Proceedings, Volume I-B, p. 569, 573-574 (1985), *available at* https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5294. *Id.*

It was this original task force that was charged with drafting a model law that states could enact to govern long-term care insurance.

In 1986, the NAIC adopted the *Long-Term Care Insurance Model Act* (#640), NAIC (2017), *available at* https://content.naic.org/sites/default/files/MO640.pdf,[3] and then adopted the *Long-Term Care Insurance Model Regulation* (#641), NAIC (2017), *available at* https://content.naic.org/sites/default/files/MO641.pdf,[4] in 1987.

Most states have adopted a version of these models. *See Model #640 State Chart*, NAIC(2020), *available at* https://content.naic.org/sites/default/files/ST640.pdf; *Model #641 State Chart*, NAIC (2019), *available at* https://content.naic.org/sites/default/files/ST641.pdf. Together, the model act and regulation set standards for all aspects of the sale and provision of individual and group long-term care insurance, including the process for rate and form filing, review, and approval.[5] Within these standards, it is critical that state insurance regulators maintain and exercise their authority to consider state-specific factors in the review of rates, including state population, demographics and geography, the state insurance and long-term care market, the cost of care, and other factors.

## II.    Accurately Pricing Long-Term Care Insurance is Critical

Accurately pricing long-term care insurance is critical and can be more complicated than pricing other lines of insurance. This is especially difficult since the period of time between issuance of the policy and a claim for benefits "can exceed 20 years or more." *Long-Term Care*

---

[3] NAIC Proceedings, Vol. I, p. 677-680 (1987), *available at* https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5304.

[4] NAIC Proceedings, Vol. I, p. 656-661 (1988), *available at* https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5321.

[5] *Long-Term Care Insurance Model Act* (#640), NAIC (2017) *available at* https://content.naic.org/sites/default/files/MO640.pdf; *Long-Term Care Insurance Model Regulation* (#641), NAIC (2017), *available at* https://content.naic.org/sites/default/files/MO641.pdf.

*Insurance: Recommendations for Improvement of Regulation, Report of the Federal Interagency Task Force on Long-Term Care Insurance*, U.S. Dept. of the Treasury (Aug. 2020), https://home.treasury.gov/system/files/136/Report-Federal-Interagency-Task-Force-Long-Term-Care-Insurance.pdf.

There are several factors insurance companies must estimate when setting rates: the number of policyholders who will need long-term care for many years into the future; the length of time claimants will receive care; the number of policyholders who will continue paying premiums over the course of many years to keep policies in force; the interest rates the insurer expects to receive from assets backing the product; and the administrative costs of providing the product. King, Eric, *Long-Term Care Insurance Pricing Basics*, CIPR Newsletter (Nov. 2016), https://www.naic.org/cipr_newsletter_archive/vol20_ltc_pricing.pdf. "Since 2000, all of these factors have gone in an unfavorable direction for insurers: morbidity is somewhat worse than expected; voluntary lapse rates are lower than for other insurance products; and interest rates are significantly lower than levels assumed in pricing."[6] *Long-Term Care Insurance: Recommendations for Improvement of Regulation, Report of the Federal Interagency Task Force on Long-Term Care Insurance*, *supra* at 4.

In recognition of the challenges of accurately pricing long-term care insurance products, the NAIC has updated Model #640 and Model #641 several times since their initial adoption. Three categories of long-term care policies exist in the states that have adopted each of these amendments: (1) pre-rate stabilized – policies priced using a minimum loss ratio approach and issued prior to the initial rate stability amendments adopted in 2000; (2) rate stabilized 2000 –

---

[6] In this context, the term "morbidity" means the rate at which increasing age and disease of insureds leads to higher claim costs, while the term "lapse rate" means the percentage of insureds that leave the block by voluntary termination.

policies issued after the state adopted the initial rate stability amendments made in 2000; and (3) rate stabilized 2014 – policies issued after the state adopted the 2014 amendments.[7] *NAIC Guidance Manual for Rating Aspect of the Long–Term Care Insurance Model Regulation*, NAIC (2016) *available at* https://www.naic.org/documents/committees_b_senior_issues_160609_ltc_guidance_manual.pdf.

The 2000 amendments were "designed to guarantee rate stability and level premiums over the life of a policy." NAIC Proceedings, 2d Qtr., p. 263-264 (2000), *available at* https://naic.soutronglobal.net/Portal/DownloadImageFile.ashx?fieldValueId=5614. The goal was to increase the likelihood that premium rates offered by companies would be adequate over the life of the policies, that rate increases would be less likely, that only justified increases would occur, and that necessary increases would be smaller and less frequent. *Id.*

Washington has policies that fall into the categories of pre-rate stabilized and rate stabilized 2000. *See* Wash. Admin. Code 284-60-060(2) (1983) and Wash. Admin. Code 284-83-005 *et seq.* (2008). Washington's rate stabilized 2000 rules apply to policies delivered or issued for delivery on or after January 1, 2009. Wash. Admin. Code 284-83-005(1) (2008). Washington has not adopted the 2014 amendments to Model #641. Because Mr. Gunn purchased long-term care insurance effective on January 1, 2000, it is the pre-rate stabilized rules that apply to his initial certificate. *Id.*

---

[7] State insurance commissioners continue to recognize the importance and challenges states face in regulating long-term care insurance financial solvency benefits and rates and have recently formed another Long-Term Care Insurance Task Force to oversee this work. *Long-Term Care Insurance Task Force*, NAIC (2021), https://content.naic.org/cmte_ex_ltci_tf.htm.

In Washington, the pre-rate stabilized rules follow the original requirements of Model #641 and require group disability insurance (long-term care insurance issued by a disability insurer) to generate at least a sixty percent loss ratio. Wash. Admin. Code 284-60-060(2) (1983).

The rate stabilized 2000 rules apply to the Washington OIC's review of CNA's rate increase filing.[8] In fact, when CNA submitted its request for a rate increase it stated "Although certain policy forms were originally priced prior to rate stability under the NAIC model regulation, certificates have been added after rate stability. Therefore, this filing is being made according to rate stability requirements." Defendant's Ex. H at 34, available at https://fortress.wa.gov/oic/onlinefilingsearch (SERFF No. CNAB-130153882). "The rate increase being requested meets the 58/85 loss ratio test established in the 2000 LTC NAIC Model Regulation." *Id.*

An insurer's filing for a rate increase includes certification by a qualified actuary that if the schedule is implemented and the underlying assumptions are realized, "no further premium rate schedule increases are anticipated" Wash. Admin. Code 284-83-090(2)(b)(i) (2008). The insurer must also submit an actuarial memorandum "justifying the rate schedule change request[.]" *Id.* at (2)(c). The Washington OIC, and other state departments of insurance, rely on their actuaries to review the filings to ensure the proposed rates comply with the law.

As the profitability of in-force long-term care insurance policies has eroded over the last twenty years, many insurers have increased premiums on those policies—sometimes "by a

---

[8] Washington's rate stabilized 2000 rules (Wash. Admin. Code 284-83-005 *et seq.*(2008)) apply to premium rate schedule increases beginning on the first group policy anniversary following January 1, 2009. Wash. Admin. Code 284-83-090(1)(b) (2008).

When some of the policies within a block of business are issued prior to the state adopting the rate stabilized 2000 amendments, insurers are permitted to seek rate increases for the block pursuant to either the pre-rate stabilized provisions or the rate stabilized provisions. *See NAIC Guidance Manual for Rating of Long-Term Care Insurance Model Regulation*, NAIC, at 13 (Mar. 1, 2005), *available at* https://www.naic.org/documents/prod_serv_supplementary_ltc_gm.pdf.

cumulative 100% or more." *Long-Term Care Insurance: Recommendations for Improvement of Regulation, Report of the Federal Interagency Task Force on Long-Term Care Insurance*, *supra* at 4. While these rate increases can be severe for consumers, "the inability to obtain timely and consistent approvals of actuarially justified rate increases may threaten the financial stability of in-force blocks of [long-term care insurance] policies and, in some cases, an insurer itself." *Id.* at 38.

Executing rate increases to ensure that future claims are adequately covered is of particular importance in the context of long-term care insurance. There are currently two national companies in state-supervised insolvency proceedings, Penn Treaty and Senior Health Insurance Plan (SHIP).[9] *See* Penn Treaty in Liquidation, https://www.penntreaty.com/Liquidation.aspx (last visited September 16, 2021); SHIP in Rehabilitation, https://www.shipltc.com/home (last visited September 16, 2021).

State regulators acknowledge that one factor contributing to the solvency issues facing the long-term care insurance industry is variation in the review and approval or denial of rate increase requests among the states. The NAIC Long-Term Care Insurance Task Force is taking steps to address the issue while maintaining the essential state control over the rate approval process. State regulators need to balance the needs of consumers with the need to maintain a solvent industry. This balancing act is carried out at the state level – by commissioners on behalf of the policyholders within their jurisdictions. *See* NAIC, https://content.naic.org/cmte_ex_ltci_tf.htm (last visited Sept. 16, 2021).

---

[9] In the ongoing SHIP rehabilitation proceedings, issues have arisen as to the scope of authority of a rehabilitator to set rates or alter policy terms without the approval of the state where the policies were issued. The NAIC has not taken a position in those proceedings and the questions before this Court are not related.

### III. The Washington Insurance Commissioner Has Extraterritorial Jurisdiction Over Rate Approval of Long-Term Care Certificates

Regulation of an individual long-term care policy is a straightforward application of the laws and regulations of the state where the policy is issued to the policyholder-resident. But when determining which state law applies to a certificate issued to a resident of one state under a group policy issued to an entity in another state, one must look to the law of the state where the certificate was issued to see whether that state has an applicable extraterritorial jurisdiction provision. If there is such a provision, that state's law applies and ends the analysis. The question before the Court here is not a traditional conflicts or choice of law question, but rather one of state authority under the national system of state-based insurance regulation.

In the context of group insurance policies, extraterritorial jurisdiction refers to the extent to which laws other than those of the "situs" affect the legality, validity, interpretation, or operation. Since they were initially drafted by the NAIC, Model #640 and Model #641 have provided insurance regulators with extraterritorial jurisdiction under certain circumstances. Model #640 provides the state regulator with extraterritorial jurisdiction over discretionary groups (groups other than employers, labor organizations, trade organizations, associations, or trusts). Model #640, Sec. 5. That section provides: "No group . . . coverage may be offered to a resident of this state under a group policy issued in another state to a [discretionary group] unless this state . . . has made a determination that such requirements have been met." *Id.*

Several states, including Washington, have expanded upon the model language to provide the insurance regulator with extraterritorial jurisdiction over certificates issued to their residents under group policies issued to employers and other groups in another state. *See, e.g.*, Alaska Stat. Ann. § 21.53.070 (1990); Ark. Code Ann. § 23-97-306 (2005); Del. Code Ann. tit. 18, § 7104 (1989); Ind. Code Ann. § 27-8-12-17 (1991); Md. Code Regs. 31.14.01.14 (2021); Mont. Code

Ann. § 33-22-1120 (1989); S.D. Codified Laws § 58-17B-14 (1989); Utah Code Ann. § 31A-22-1403 (1991); Wash. Rev. Code Ann. § 48.21.010(2)(b) (2016). These states, like Washington, maintain a policy that because consumers pay for and will use the long-term care benefits in the state where they live, the state has an interest in protecting those benefits via rate review and approval.

Washington law evidences its extraterritorial reach in other statutory provisions as well. The insurance code governs "[a]ll insurance and insurance transactions in this state, or affecting subjects located wholly or in part or to be performed within this state, and all persons having to do therewith [.]" Wash. Rev. Code Ann. § 48.01.020 (1947). The term "insurance transaction" is defined broadly to include any: "[t]ransaction of matters subsequent to execution of the contract and arising out of it." Wash. Rev. Code § 48.01.060 (1947).

Additionally, Washington's unfair trade regulations makes it an unfair practice for an insurer to provide "disability insurance coverage on individuals in this state under a group policy delivered to a policyholder outside this state when" the policy or certificate providing coverage in Washington does not meet the requirements of the disability and long-term care insurance laws, including the loss ratio standards applicable to group insurance. Wash. Admin. Code 284-30-600(1) (2010).[10]

The cumulative effect of the several statutes and regulations providing the Washington insurance commissioner with authority to approve premium rates for certificates issued in Washington pursuant to a policy issued in another state makes clear that the Washington OIC was

---

[10] Washington law provides that "disability insurance" includes "long-term care insurance issued by a disability insurer[.]" *See* Wash. Admin. Code 284-54-600 (1987).

within its jurisdictional power to approve the rates of Mr. Gunn's certificate, and Washington law governs approval of the rate increase.

Because the Washington OIC properly wielded its authority in approving the rates filed by CNA, thereby further protecting the insurer's solvency, it could also have brought an enforcement action against CNA for failure to charge the rates it was legally required to charge. Wash. Rev. Code Ann. § 48.02.080(3) (2009).

## IV. The Filed Rate Doctrine Prevents Consumers from Challenging Rates Approved by the Washington Insurance Commissioner

As part of the balance between protecting consumers while also protecting the financial solvency of insurers (so they can pay potential claims), insurance commissioners are charged with ensuring that premium rates are not "excessive, inadequate, or unfairly discriminatory." *See, e.g.*, Wash. Rev. Code Ann. § 48.19.020 (1947). To prevent unfairly discriminatory premium rates, an insurer must show that the initial rate and the proposed increase will be applied uniformly as to all similarly situated Washington insureds. Wash. Rev. Code Ann. § 48.18.480 (1947). Additionally, the commissioner must ensure that the benefits provided are "reasonable in relation to the premium or price charged." Wash. Admin. Code 284-54 (2008).

States that apply the filed-rate doctrine, like Washington, do so as an acknowledgment of the insurance commissioners' expertise in rate review and approval. *See, e.g.*, *Ex parte Cincinnati Ins. Co.*, 51 So.3d 298 (Ala. 2010); *Schirmer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307 (Minn. 2006); *Minihane v. Weissman*, 640 N.Y.S.2d 105 (N.Y. App. Div. 1996); *McCarthy Fin., Inc. v. Premera*, 347 P.3d 872 (Wash. 2015); *Prentice v. Title Ins. Co. of Minnesota*, 500 N.W.2d 658 (Wis. 1993).

This doctrine provides that "any 'filed rate'—a rate filed with and approved by the governing regulatory agency—is per se reasonable and cannot be the subject of legal action against

the private entity that filed it." *McCarthy Finance, Inc.*, 347 P.3d 872 at 875 (quoting *Tenore v. AT&T Wireless Servs.*, 962 P.2d 104, 108 (Wash. 1998)). The purposes of the doctrine are: "(1) to preserve the agency's primary jurisdiction to determine the reasonableness of rates, and (2) to insure [sic] that regulated entities charge only those rates approved by the agency." *Id.*

Courts "must be cautious not to substitute [their] judgment on proper rate setting for that of the relevant agency[.]" *Id.* This is because the "regulatory agencies presumably are most familiar with the workings of the regulated industry and are in the best position, due to experience and investigative capacity, to establish the proper rates." *Minihane*, 640 N.Y.S.2d 102.

It is the insurance departments, and in this case, the Washington OIC, that is most familiar with the requirements for actuarially justified rates of long-term care insurance coverage and with the "on the ground" factors in Washington that impact the application of those requirements. Because the filed-rate doctrine applies and allows the Washington OIC's approved rate, a choice of law analysis is inapplicable. Preservation of an insurance department's properly exercised jurisdiction is critical to maintaining the national system of state-based insurance regulation.

## CONCLUSION

The NAIC, as *amicus curiae*, respectfully requests that the Court consider the points made herein in resolving this case.

Date:     September 16, 2021                    Respectfully submitted,

                                                /s/ Michael T. Raupp
                                                MICHAEL T. RAUPP
                                                HUSCH BLACKWELL LLP
                                                4801 Main Street, Suite 1000
                                                Kansas City, Missouri  64112
                                                (816) 983-8000
                                                (816) 983-8080 (FAX)
                                                michael.raupp@huschblackwell.com

                                                *Attorneys for the National Association of
                                                Insurance Commissioners*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2021, I filed the foregoing **Brief of the National Association of Insurance Commissioners as *Amicus Curiae*** with the Clerk of the U.S. District Court via the Court's CM/ECF system, which will cause a true and correct copy of the same to be served electronically on all CM/ECF-registered counsel of record.

/s/ Michael T. Raupp
*Attorney for the National Association of*
*Insurance Commissioners*

14